Royal Arrow Co., Inc. v. Commissioner. Edward R. and Virginia Mims v. Commissioner.
Royal Arrow Co. v. Commissioner
Docket Nos. 3560-70, 3561-70.
United States Tax Court
T.C. Memo 1972-58; 1972 Tax Ct. Memo LEXIS 196; 31 T.C.M. (CCH) 241; T.C.M. (RIA) 72058; March 1, 1972, Filed *196 1. Held: Payments made by petitioner Royal Arrow Co., Inc. to Hugh P. and Rosa Emerson in the taxable years 1966 and 1967 pursuant to an employment contract entered into contemporaneously with the sale of its stock to petitioners Edward R. and Virginia Mims are deductible as reasonable compensation or as an ordinary and necessary business expense under section 162, I.R.C. of 1954. 2. Held: The payments made by Royal Arrow Co., Inc. to Hugh P. and Rosa Emerson in the taxable year 1967 pursuant to said employment contract were not a part of the purchase price of the stock and were not taxable to petitioners Edward R. and Virginia Mims as a dividend under sections 61 and 316, I.R.C. of 1954. William R. Frazier, 816 Atlantic Bank Bldg., 121 W. Forsyth St., Jacksonville, Fla., and Elliott Adams, for the petitioners. Donald W. Williamson, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: In Docket No. 3560-70, the respondent determined deficiencies in the income tax of petitioner Royal Arrow Co., Inc. in the respective amounts of $3,360 for the taxable year ended December 31, 1966 and $12,000 for the taxable year ended December 31, 1967. The only question presented for decision is whether certain amounts paid in 1966 and 1967 by said petitioner to Hugh P. and Rosa Emerson pursuant to a consulting and advisory contract between the parties were deductible under section 162. [1]
*198 In Docket No. 3561-70, the respondent determined a deficiency in the income tax of petitioners Edward R. and Virginia Mims in the amount of $8,817.78 for the taxable year ended December 31, 1967. The only question presented for decision is whether an allocable portion of the $25,000 paid by Royal Arrow Co., Inc. to Hugh P. and Rosa Emerson in the year 1967 pursuant to said contract was taxable to petitioners/stockholders Edward R. and Virginia Mims as a dividend within the meaning of sections 61 and 316. The cases were consolidated for purposes of trial, briefing, and opinion. 242 Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are herein incorporated by this reference. Petitioner Royal Arrow Co., Inc. (hereinafter referred to as "Royal Arrow") is a corporation organized in 1931 under the laws of the State of Florida, with its principal place of business in Jacksonville, Florida. It filed its Federal income tax returns for the calendar years 1966 and 1967 with the district director of internal revenue, Jacksonville, Florida. Petitioners Edward R. and Virginia Mims, husband and wife, were legal residents *199 of Orange Park, Florida, at the time the petition herein was filed. They filed their joint Federal income tax return for the calendar year 1967 with the district director of internal revenue, Jacksonville, Florida. At all times material herein, Hugh P. and Rosa Emerson were the sole stockholders of Aeroland Oil Company (hereinafter referred to as "Aeroland"), a corporation whose principal place of business was Miami, Florida. Hugh P. Emerson was President and Treasurer and Rosa Emerson was Assistant Secretary and Assistant Treasurer of Aeroland. Prior to 1933, Aeroland marketed petroleum products for Richfield Oil Corporation of New York. In 1933, Richfield Oil Corporation of New York released Aeroland from its contract. Aeroland thereupon entered into a contract with Standard Oil Company of Kentucky (hereinafter referred to as "Standard of Kentucky"). Thereafter, Aeroland acted as a wholesaler and retailer of petroleum products and allied products for Standard of Kentucky. It also owned and operated Standard of Kentucky retail service stations. Its area of operations was the lower east coast of Florida, including Dade and Broward Counties. A corporation which acts in the above *200 manner for a large oil company such as Standard of Kentucky is commonly referred to as a "jobber" for said oil company. Royal Arrow was originally incorporated in 1931 as the Suwanee Oil Company (hereinafter referred to as "Suwanee") by individuals not involved in the matter herein. Edward R. Mims was originally employed by Suwanee in 1945 as its General Manager at a time when Suwanee was distributing petroleum products for Cities Service Company in the Jacksonville area (or Duval County, as it will hereinafter be referred to). Prior to his employment by Royal Arrow, he had been employed as the local representative for Cities Service Company in the same area. In. 1947, Aeroland acquired all of the outstanding stock of Suwanee. Shortly thereafter, the Suwanee name was changed to Royal Arrow, and Aeroland sold to Edward R. and Virginia Mims 25 percent of its stock in Royal Arrow for $7,800. Thereafter, the Mimses owned 225 shares and Aeroland owned 675 shares of the stock of Royal Arrow. Edward R. Mims was Vice President and General Manager of Royal Arrow. Hugh P. Emerson was President and Treasurer of Royal Arrow and Rosa Emerson was Assistant Secretary and Assistant Treasurer of *201 Royal Arrow. In 1954, Royal Arrow discontinued its association with Cities Service Company and became the distributor for Standard of Kentucky in Duval County. As a result, Royal Arrow sells the products of Standard of Kentucky, such as kerosene, fuel oil, motor oil, tires, batteries, and accessories, to retail outlets. It also owns and operates a chain of service stations. Some of these stations operate under the Standard of Kentucky brand and some do not. Standard of Kentucky is, and has been, a leading marketer of petroleum products in Duval County, in terms of volume. Royal Arrow was the only independent distributor of Standard of Kentucky products in Duval County. Standard of Kentucky directly handled the balance of the distribution of its products in Duval County. The contract granting Royal Arrow the right to distribute Standard of Kentucky products ran from year to year and was terminable by either party. As Vice President and General Manager of Royal Arrow, Edward R. Mims made the day-to-day decisions regarding the operation of the business, as well as marketing and sales. Hugh P. Emerson was concerned primarily with the operation of Aeroland. However, he had overall *202 supervision of Royal Arrow as its President and, along with Mrs. Emerson, held the controlling interest. Consequently, Hugh P. Emerson made the final decisions on matters other than those involved in the day-to-day operations of the business. Such matters included the developments of new "sites," lease agreements of any magnitude, and any large expenditures of funds. In addition, Hugh P. Emerson personally handled the 243 contracts with Standard of Kentucky and other suppliers. He had close business contacts with the management of Standard of Kentucky. During the years 1962 to 1965, inclusive, the salaries paid by Royal Arrow to its officers were as follows: Hugh P.
Rosa
Edward R.
Year
Emerson
Emerson
Mims
1962
$16,400
$3,200
$30,000
1963
20,400
1,200
40,000
1964
25,900
1,200
45,000
1965
28,400
1,200
75,000
In 1966, Standard Oil of California (hereinafter referred to as "Standard of California") acquired control of Standard of Kentucky. Hugh P. Emerson thereupon entered into an agreement with Standard of California whereby the business of Aeroland would be acquired by Standard of Kentucky through an exchange of Aeroland stock *203 for stock of Standard of California. It was also agreed that prior to the exchange Aeroland would dispose of its stock interest in Royal Arrow. For several years prior to 1966, Hugh P. Emerson and Edward R. Mims had discussed the possible purchase by Edward R. Mims of the Royal Arrow stock of Aeroland. However, the discussions had been of an informal nature. No serious offer had been made by Edward R. Mims and no price set by Hugh P. Emerson. Following the agreement with Standard of California, Hugh P. Emerson and Edward R. Mims entered into negotiations for the sale of the Royal Arrow stock by Aeroland to Edward R. Mims. As a result of these discussions, the parties agreed upon a plan whereby the Mimses would be enabled to acquire complete ownership of Royal Arrow. On September 29, 1966, there was held a special meeting of the board of directors of Royal Arrow. Minutes of that meeting read in pertinent part as follows: The Chairman announced that Mr. Hugh P. Emerson, formerly President and Treasurer, and Mrs. Rosa Z. Emerson, formerly Assistant Secretary and Assistant Treasurer, had resigned as Directors and Officers of Royal Arrow Co., Inc., and further announced that he was *204 thereupon tendering his resignation as Vice President; and further announced that the first order of business would be to elect a President, Vice President, Treasurer, Secretary, Assistant Treasurer and Assistant Secretary. Upon motion duly made, seconded and unanimously carried, the following officers were elected: Edward R. Mims, President and Treasurer; Virginia M. Mims, Vice President and Secretary; and Herbert E. Elphick, Assistant Secretary and Assistant Treasurer. After a thorough discussion, the following Resolution was proposed and unanimously adopted: WHEREAS Aeroland Oil Company has a plan for discontinuing the operation of its gasoline and oil distribution business and selling all of its assets to Standard Oil Company (Incorporated in Kentucky), and before making such sale desires to sell and dispose of all of the capital stock of Royal Arrow Co., Inc. which it owns and holds, and has offered to sell to the company said stock, being 675 shares at the price of $370.37037 per share; and WHEREAS the Directors find that the price at which the stock is offered is the market price and a fair price and that it is in the interest of the Company to purchase 270 shares only *205 of such stock at the price aforesaid, NOW THEREFORE BE IT RESOLVED by the Board of Directors of Royal Arrow Co., Inc. that the proper officers of the Company be and they hereby are authorized and directed to purchase from Aeroland Oil Company two hundred and seventy shares of capital stock of Royal Arrow Co., Inc. at $370.37037 per share, and to pay to the Aeroland Oil Company from the Company's funds, the total purchase price of, to-wit, $100,000.00. BE IT FURTHER RESOLVED that the acts and doings of the officers of the Company in arranging and contracting for the purchase of the stock aforesaid be and the same hereby are ratified, approved and confirmed. After a thorough discussion, the following Resolution was proposed and unanimously adopted: BE IT RESOLVED by the Board of Directors of Royal Arrow Co., Inc. that upon the purchase of two hundred and seventy shares of the Company's stock from Aeroland Oil Company, the said stock shall be retired on the books of the Company. * * * After a thorough discussion, the following Resolution was proposed and unanimously adopted: BE IT RESOLVED by the Board of Directors of Royal Arrow Co., Inc. that the salary for the services *206 of Mr. Hugh P. Emerson, as President and Treasurer of the Company for the year 1966 to date, be adjusted to more clearly reflect the value of such services, and to pay Mr. 244 Emerson $18,750 as additional salary for the first three quarters of the year 1966. After a thorough discussion, the following Resolution was proposed and unanimously adopted: BE IT RESOLVED by the Board of Directors of Royal Arrow Co., Inc. that the Company should retain the services of Hugh P. Emerson and Rosa Z. Emerson as consultants and advisers to avail the Company of their knowledge and experience in the operation of gasoline, oil and petroleum business for a period of six years, upon the payment to said consultants of $25,000 per annum, payable in eleven equal monthly installments of $2,000 each, and one monthly installment of $3,000; and the proper officers of the Company be and they hereby are authorized and directed to make and execute with said Hugh P. Emerson and Rosa Z. Emerson, his wife, a Consulting and Advisory Contract to more fully spell out and make certain the services to be performed by such consultants and the respective obligations of the parties thereto. On September 29, 1966, Royal *207 Arrow acquired 270 shares of the stock of Royal Arrow from Aeroland for $100,000. Royal Arrow then retired the aforementioned shares of stock. Also on September 29, 1966, Edward R. and Virginia Mims acquired the balance of 405 shares of the stock of Royal Arrow from Aeroland for $150,000. On October 1, 1966, Royal Arrow entered into a contract with Hugh P. and Rosa Emerson whereby Royal Arrow agreed to pay the Emersons $25,000 per year for six years (at the rate of $2,000 per month for 11 months and $3,000 for one month), in exchange for which the Emersons would "* * * provide their personal services as consultants, in an advisory capacity, to consider and advise on problems of business and management which from time to time confront the managing officers of the Company, and give to the Company's managing officers the benefit of their experience and knowledge of the business." In the event that either of the Emersons were to die during the six-year term, Royal Arrow was obligated to continue the payments to the survivor for the remainder of said term. Within a few days following the sale of the Royal Arrow stock by Aeroland, Hugh P. Emerson exchanged the stock of Aeroland for *208 stock in Standard of California. As a result, Royal Arrow became the only independent "jobber" of Standard of Kentucky products in Florida. Royal Arrow duly paid to Hugh P. and Rosa Emerson the salaries due to them as officers for the period ending September 30, 1966. In addition, Royal Arrow paid to Hugh P. and Rosa Emerson, pursuant to the contract of October 1, 1966, the sum of $7,000 for the year 1966 and the sum of $25,000 for the year 1967. The plan whereby all of the stock of Royal Arrow would be acquired by Edward R. and Virginia Mims for $250,000, coupled with the consulting agreement calling for the payment of $25,000 a year over the ensuing six years, was first proposed by Edward R. Mims. Edward R. and Virginia Mims could not and would not have paid $400,000 for the stock in Royal Arrow held by Aeroland. Hugh P. Emerson, acting for Aeroland as the seller, would not have agreed to the sale of Aeroland's stock of Royal Arrow for $250,000 without an agreement for additional consideration or compensation. The following schedule shows the gross sales, earnings, and net worth on the books of Royal Arrow for the years 1961 to 1966, inclusive: Gross
Net Worth
Year
Sales
Earnings
Per Books
1961
$1,633,191.13
$20,065.03
$ 202,210.56
1962
1,716,916.40
23,181.48
198,392.04
1963
1,755,326.84
29,655.45
201,047.49$61964
1,940,748.31
38,865.14
213,389.45
1965
2,522,979.70
34,027.01
237,516.46
1966
2,565,402.09
34,836.63
168,457.84
*209 The valuation of $370.3703 per share for the stock of Royal Arrow, approved by the board of directors of Royal Arrow at the meeting of September 29, 1966, was approximately one and one-fourth times the net worth of the corporation and ten times earnings. The fair market value of the stock was not in excess of $370.3703 per share. On its Federal income tax returns for the taxable years 1966 and 1967, Royal Arrow deducted the sums of $8,210 and $28,155.50, respectively, as "professional services" incurred in the course of its business. In his notice of deficiency, respondent disallowed the claimed deductions for such payments to the extent of $7,000 and $25,000, respectively, claiming as follows: * * * the disallowed amounts represent payments made as partial consideration in connection with the acquisitions * * * and do not represent reasonable compensation for personal services rendered or ordinary and necessary business expense. * * * 245 On their Federal income tax return for 1967, Edward R. and Virginia Mims reported taxable income of $80,951.29. In his notice of deficiency, respondent determined that, since 60 percent of the shares of stock acquired from Aeroland was *210 acquired in the name of Edward R. and Virginia Mims, 60 percent (or $15,000) of the $25,000 paid to Hugh P. and Rosa Emerson by Royal Arrow in 1967 was paid on behalf of Edward R. and Virginia Mims and, therefore, was taxable to them as a dividend in that year within the provisions of section 61 and section 316. Opinion In this case, we are called upon to determine the legal effect of the payments made during the taxable years 1966 and 1967 by Royal Arrow to Hugh P. and Rosa Emerson pursuant to a so-called "consulting contract" entered into as a part of a plan whereby the Emersons indirectly disposed of the controlling interest in Royal Arrow. The facts are not seriously disputed. Hugh P. and Rosa Emerson owned all of the stock of Aeroland, a corporation engaged in the distribution of the products of Standard of Kentucky in the Miami area. In turn, Aeroland owned 675 shares out of a total of 900 shares of stock of Royal Arrow. Edward R. and Virginia Mims owned the other 225 shares. Royal Arrow distributed the products of Standard of Kentucky in the Jacksonville area. In 1966, Hugh P. Emerson decided to get out of the oil business. In accordance with a prior commitment, he agreed *211 with Standard of Kentucky to exchange the stock of Aeroland for stock of Standard of California. As a part of this agreement, it was required that Aeroland first dispose of the 675 shares of stock of Royal Arrow. As might be expected, Hugh P. Emerson thereupon offered to sell such stock to Edward R. Mims. The ensuing negotiations between Hugh P. Emerson and Edward R. Mims were made the more difficult by reason of the fact that Mims did not have sufficient cash with which to purchase the stock. In order to satisfy Emerson, Mims thereupon proposed a plan whereby a part of the stock would be first redeemed by Royal Arrow for $100,000 in cash. Mims would purchase the balance for $150,000. In addition, Royal Arrow would enter into an agreement to pay $25,000 per year to Hugh P. and Rosa Emerson for a period of six years, making a total of $150,000, in consideration for the agreement on their part to provide consultation and advice during the term of the contract. The respondent has disallowed the deduction by Royal Arrow of the amounts paid pursuant to the contract for the years 1966 and 1967, and taxed as a constructive dividend to Edward R. and Virginia Mims a proportionate share *212 of such payments. In support of this determination, respondent has not challenged the reasonableness of the payments either on the basis of the contract or on the basis of any services actually rendered during the period in question. On the contrary, in his reply brief the respondent states: The petitioners' further contention that the payments under the "Consulting Contract" are reasonable in amount is, we submit, of little significance in this case since the only real issue is whether the payments were for consulting services or for stock. If, in fact, such payments are for services, we do not question their reasonableness (albeit services may not have been performed). * * * Our sole position in all events is narrowed to the proposition that the consulting arrangement was presented to Emerson by Mims in a package deal, not separate and apart from the purchase of the stock as the petitioners assert, but as further inducement to Emerson to sell the stock. It must be remembered that Emerson testified that he would not have sold the stock if not for the guarantee of an additional $150,000.00 under the consulting arrangement. Thus, the payments necessarily represented consideration *213 for the purchase of the stock. In support of this position the respondent further argues that the consulting contract was merely a "sham" or a subterfuge devised in order to provide for the payment by Edward R. Mims of an additional $150,000 as a part of the purchase price of the stock. [2]
We cannot accept the respondent's contention that, since the consulting contract was a part of the overall plan whereby Edward R. Mims would acquire the balance of the stock of Royal Arrow and constituted an "inducement" for the sale of such stock, any amounts paid thereunder must, as a matter of law, be regarded as a 246 part of the sales price. The sale of a business by an owner or controlling stockholder, accompanied by a contract for employment or advisory services by the seller, is not uncommon. The fact that the agreement with respect to the sale of the business and the contract for services are integral parts of a single transaction does not, as a matter of law, make *214 the payments under the service contract other than "compensation." Cf. Nassau Suffolk Lumber & Supply Corp., 53 T.C. 280 (1969). Rather, we must look to the facts. The respondent would have the Court find that there was, in substance, an agreement to sell the stock for $400,000 and that the consulting contract was merely a device to pay the additional $150,000. The facts show otherwise. The evidence clearly shows that the redemption of a part of the Aeroland stock, the sale of the remaining stock held by the Emersons and the consulting contract were a part of a single plan for the sale by the Emersons of their interest in Aeroland. It is equally clear that the Emersons received a "fair price" for their stock without regard to any benefits derived from the consulting contract. Finally, irrespective of the extent to which the Emersons might be called upon for their services during the life of the contract, there was a mutuality of consideration which gave it substance. Aeroland clearly stood to derive a benefit from the contract, regardless whether that benefit stemmed from any services to be performed by the Emersons or from the fact of their continued association *215 with Aeroland. There is no evidence either that Hugh P. Emerson demanded $400,000 for the stock or that Edward R. Mims would have been willing to pay that amount. In fact, such a price would clearly have been excessive in relationship to the net worth and earnings of Royal Arrow. Nor was the consulting contract equivalent to the payment of $150,000. Its value was considerably less than that amount. Rather, the conclusion is inescapable that, while the consulting contract was an inducement for Emerson to sell the stock at the agreed price, it was only an "inducement" and not a part of the price. Mims paid a fair price for the stock. [3] In this respect, the facts make this case distinguishable from The Nicholas Company, 38 T.C. 348 (1962), where the assets were purchased for a nominal consideration plus a so-called "employment contract." In determining the deductibility of the amounts paid by *216 Royal Arrow, even assuming that the payments were not part of the purchase price for the stock, the Court must also look to the reasonableness of those payments in light of the services called for and the possible benefits accruing to the payor. J. Strickland & Company v. United States, 352 F. 2d 1016 (C.A. 6, 1965), certiorari denied 384 U.S. 950; The Nicholas Company, supra. The amounts paid to Hugh P. and Rosa Emerson during the period in question were arrived at through arm's-length bargaining between the parties and were considered by them to be reasonable. Upon consideration of these circumstances, and in view of the concessions made by the respondent in his reply brief (supra, p. 17), we can find no error in their judgment. The Emersons were obligated to stand ready and willing to serve, if called upon. As respondent noted, the Emersons were called upon to do no more nor less than they had done in prior years as officers of Royal Arrow. In addition, however, their continued association with Royal Arrow provided an element of "security" with respect to the franchise from Standard of Kentucky. Respondent argues that this element of *217 "security" is tantamount to the acquisition of goodwill and should be capitalized on that account. Royal Arrow did not buy the goodwill represented by the franchise. The company already had the franchise. On the basis of the foregoing, it is our opinion that, with respect to Docket No. 3560-70, the payments made by Royal Arrow in accordance with the consulting contract during the years 1966 and 1967 were properly deducted under section 162. In addition, with respect to Docket No. 3561-70, it is our opinion that the amount paid by Royal Arrow during the taxable 247 year 1967 was not taxable to the petitioners as a dividend within the meaning of sections 61 and 316. Decision will be entered for the petitioner in Docket No. 3560-70. Decision will be entered for the petitioners in Docket No. 3561-70. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Somewhat inconsistently, respondent has not allowed the resulting deduction for "unstated interest" under section 483.↩
3. In fact, Casner v. Commissioner, - F. 2d - (C.A. 5), decided September 27, 1971, would indicate that Mims should be deemed to have paid $250,000 for the stock held by Aeroland.↩